Lyle DURDAHL, Appellant (Defendant),

v.

BANK OF CASPER, a Wyoming banking corporation, Appellee (Plaintiff).

No. 85–279.

Supreme Court of Wyoming.

April 24, 1986.

John I. Henley, of Vlastos, Brooks & Henley, P.C., Casper, for appellant (defendant).

Kenneth R. Marken, of Marken & Anest, Casper, for appellee (plaintiff).

Before THOMAS, C.J., BROWN, URBIGKIT and MACY, JJ., and GUTHRIE, J., Retired.

URBIGKIT, Justice.

The trial court granted summary judgment in favor of the Bank of Casper (Bank), the lender, in an amount of $54,-535.29 for unpaid principal and accrued interest, plus accruing interest, $5,000.00 attorney's fees, and costs of $27.63, on a secured promissory note which was in default. Appellant, Lyle Durdahl, the borrower, claims that material factual issues exist which preclude summary judgment.

We reverse and remand.

Appellant Durdahl framed the issues:
1. "The question of how much, if any, money is owed to the appellee is a material question of fact and precludes summary judgment for the appellee."
2. "A material question of fact exists as to whether or not the appellee acted in a commercially reasonable manner subse-

quent to the repossession of certain collateral."

3. "The court erred in granting $5,000.00 in attorney's fees for the appellee's collection efforts."

Appellee Bank of Casper claims that:

1. "No genuine issue of material fact existed concerning appellee's prima facie case."

2. "Appellant's issues of fact in opposition are not material and/or admissible."

3. "The court did not err in making its award of attorney's fees to appellee."

An additional problem arises from the denial by the trial court of the Durdahl motion to file an amended answer and counterclaim, determined by the court to be "moot by virtue of this [summary judgment] ruling."

The facts in this case are of a nature best described as hard to believe. We state the facts that appear without conflict in the record on appeal, without any expectation of what a trial on the merits will adduce. Involved is a lending transaction to renovate a Greyhound bus for individual motorhome usage.

As we said in a recent case, *Fiedler v. Steger*, Wyo., 713 P.2d 773, 776 (1986):

"This court, as did the trial court, takes the record as presented for the summary-judgment hearing, and cannot recreate the facts which may have been or do not appear."

## I

### Pleadings

First, we review the pleadings which come to us on appeal from summary judgment, wherein the Bank filed a complaint on a promissory note, alleging failure to pay, default and a principal balance due of $42,506, plus accrued and accruing interest. (It may be that the total was $40,000 principal, plus $2,506 added interest, plus accruing interest from an unstated date, if the affidavits of the defendant are accurate.)

By answer, Durdahl admitted the execution of the note, denied the default delinquency or amount due, and stated as affirmative defenses failure to state a claim, noncompliance with the Wyoming Uniform Commercial Code, breach of the loan agreement, and repossession of security which had not been resold.

The Bank moved for summary judgment, with attached affidavits, the first by an officer of the Bank, describing the note of $70,006 ($70,000 plus a title and filing fee of $6.00), due date of March 27, 1984, failure to repay, with an unpaid principal balance of $42,506, plus accrued and accruing interest based upon the current floating rate, two per cent above the prime rate of interest charged by the bank, which interest equaled $11,334.94, as of September 17, 1985, and an accrual rate thereafter. Also filed was an affidavit signed by a Casper attorney in regard to attorney's fees, which, without enumeration of the work involved or other facts, stated:

"5. A reasonable attorney's fee in this case is therefore Five Thousand Dollars ($5,000).

"6. This fee is consistent with and based upon the criteria set forth in the American Bar Association Standards relative to attorney's fees."

Durdahl filed a motion to file an amended answer and counterclaim, which amended answer more specifically contended for a set-off in a greater amount than was due on the note, and a counter-claim which alleged failure to advance funds as agreed, fraudulent charge to defendant's account, lender failure in a duty to insure the bus, repossession of security without disposition, conversion, loss of profit, destruction of collateral by act of the Bank, and fraudulent misrepresentation.

Two affidavits, one signed by Durdahl and the second by Donald L. Hedges, were attached as a resistance to the motion for summary judgment and in support of the motion for leave to amend which will be described more specifically in the statement of facts.

Based on this record, the district court granted summary judgment in the amount of $42,506 principal, accrued interest of

$12,029.29 and accruing interest, and $5,000 attorney's fees. Further:

"That Defendant's 'Motion to File Amended Answer and Counterclaim' is moot by virtue of this ruling."

Durdahl then filed a motion to open judgment and for reconsideration and attached supplemental affidavits of Hedges and Durdahl. That motion was denied, and the Bank then proceeded in execution collection efforts, including garnishee notice and summons to attempt to garnishee Durdahl's wages. Each party filed a statement of proceedings which in significant detail are categorically in dispute, and the district court did not "review the respective 'Statement of Proceedings' filed by the parties herein and approve an appropriate and accurate Statement for the Clerk of the District Court to include in the Record on Appeal." Consequently, from the standpoint of facts, we will consider the filed affidavits in the record as the only facts now available for appellate review.[1]

## II

### Facts Presented by Affidavits

Since the affidavits are not factually in specific conflict, and the Bank did not choose to file responsive affidavits to the extended affidavits filed by Durdahl and Hedges, we have a case for decision with the following rather interesting facts.

Durdahl approached the Bank of Casper with a proposal to borrow $70,000 to buy a Greyhound bus to convert through the services of Hedges into a motor home for resale. Signing a promissory note for $70,006, he gave an undetermined security interest (no one saw fit to attach a copy of any security documents to the affidavits or for filing in the record) in a Worthington engine, a gas compressor, and a Greyhound bus. We only know this by virtue of statements in the affidavits, and the fact that the promissory note and disclosure statement stated, "This note is further secured by Security Agreement dated 9/29/83, Worthington Engine, gas compressor, Greyhound Bus." The optional provision in the promissory note was not checked, which stated:

"_____ I desire property damage insurance at a cost of $_____, for a period of __ months."

Likewise, a sentence was not checked which stated:

"_____ I do not desire property damage insurance from lender and will provide proof of coverage or property damage insurance to lender as required."

Durdahl then entered into an agreement with Hedges to acquire and convert the bus into a motor home, and the Bank gave Hedges $30,000 to begin the project, as an advance on the Durdahl note. Hedges made a down payment of $10,000 on the bus from these funds, and moved the bus to his shop, where it was torn down and refurbishing commenced.

At this stage of renovation, the Bank refused to advance any more money to Durdahl on his $70,000 note, thus delaying the renovation project for at least two weeks.

For reasons then unexplained, the Bank approached Hedges and loaned him some money to finish the project, the amount thereof not being determinable from the present record. Thereafter, following exhaustion of the separate credit line of Hedges, the Bank then advanced Hedges another $10,000, and possibly, to make sense from the file, $12,500 which was charged to the Durdahl note and given directly to Hedges without either approval or knowledge of Durdahl.

Hedges stated in his affidavit that when the Bank loaned him the money to finish the work on the bus the Bank required Hedges to "put the title to the bus in their name," and, after the bus was completed, Donn Dorsett of the Bank gave him per-

---

1. In accord with the rule for consideration on appeal of summary judgment, this court will review the evidence as originally received and considered by the trial court. *Fiedler v. Steger,* supra.

mission to take it anywhere and attempt to sell it.

With title (according to the record) in the Bank's name, and the bus then reconverted with a reasonable value of $125,000, and Hedges feeling that he had a buyer for the bus for $125,000 in the southern part of Wyoming, Hedges then stated that "the bus crashed when I stopped on Red Canyon to go to the bathroom, and it rolled down a hill and off the road."

Lo and behold, from the factual statements in the record, we do not know what happened thereafter to the residue of the bus. It seems to have evaporated.[2] Prior to the accident in which the bus presumably was totaled, the Bank received a notice that the insurance had or would expire, but did not notify Hedges of the expiration of the insurance policy, and consequently there was no insurance at the time the unit was totaled. The Bank then repossessed a compressor from Durdahl, which they placed in Hedges' yard for safekeeping and where it apparently still is, or was at the time of oral argument.

A modest internal conflict in the Hedges affidavit does seem to exist:

"* * * [T]he Bank of Casper required that they be named as, and were in fact named as a loss payable insured on said bus,"

since as owner this would be unlikely.

The Durdahl affidavit is generally consistent with the Hedges affidavit in further describing the loan transaction and that a gas compressor was repossessed by the Bank and not thereafter liquidated as a chattel security and credited to the secured indebtedness, and in further saying:

"* * * [P]rior to the events which occurred above, I had investigated the market for such motor homes and found an excellent market in Arizona. The motor home such as the one I was building were being bought and sold for $120,000 or more."

Supplementary affidavits, also signed by Hedges and Durdahl, which were filed with the motion to open judgments, denied, for reasons that are factually unclear, a partnership relationship, and further by Hedges:

"That after the bus was complete, I permitted Mr. Durdahl to make suggestions on how the bus would be sold, but he did not have title to the bus and did not dictate to me how the bus should be marketed. Indeed, I remember one occasion when he wanted to take the bus to Arizona to market it, but I refused him this opportunity."

And by Durdahl:

"That if the Bank of Casper had complied with their agreement, Mr. Hedges would not have been in control of the bus and I would have marketed the bus much differently, including taking it to Arizona where the market for mobile homes is best."

The district court found that there was no genuine dispute as to any material fact (which may be nearly true as to the record before us), and that the plaintiff was entitled to judgment as a matter of law (which is certainly not true under the evidentiary status created by the filed affidavits).

We determine that the district court's order of summary judgment prematurely terminated the litigation, observing that with the present status of the record, the Bank of Casper was not entitled to judgment as a matter of law, nor were all litigable factual issues at this juncture resolved by the filed documents. *Wyoming Insurance Department v. Sierra Life In-*

---

2. We have cause to wonder whether some sheepherder at the bottom of Red Canyon is now utilizing the bus as a way station. Of interest, but not of record, is the geographical fact that Red Canyon, in the vicinity of Lander, Wyoming, encompasses an irregular, sloped drop of more than a thousand feet. It is a substantial and scenic canyon, and a convenient road access to the bottom of the canyon area does exist. A vehicle, if not held up in going down, would be severely dented in reaching the bottom. However, it would still have value, and would normally be retrieved. Depending upon where a vehicle might go off into the Red Canyon, if still there it could probably be seen by casual examination from the overlook at the top.

*surance Company,* Wyo., 599 P.2d 1360 (1979).

At least four material issues of fact or questions of law arise. As a fifth concern, we would add the holding that the counterclaim issues were rendered moot by a judgment on the promissory note. Those issues would include the disposition by the Bank of the gas compressor owned by Durdahl and given as security, which raises legal questions; confusion regarding title to the bus, which in fairness to all parties raises a material factual question; what was the chargeable amount on the note; and whether the affidavit upon which the award of attorney's fees was based is legally sufficient.

## III

### *Repossession of the Compressor*

A most troublesome question perceived by this court is, what occurs when a lending institution has repossessed security and then proceeds to sue on the note without completing the foreclosure process?

The five principal remedies given to the secured party upon default by the debtor were explained in *Eggeman v. Western National Bank,* Wyo., 596 P.2d 318 (1979). The fifth remedy described in that opinion appears to be the remedy contemplated by the lender in this case:

"5. Take a judgment on the underlying obligation, and proceed under the judgment. * * * The procedure for this remedy is not set out in the Uniform Commercial Code, i.e., § 34–21–101, et seq., W.S.1977. The usual procedure for enforcement of judgments for money is set out in § 1–17–101, et seq., W.S.1977. Usually the judgment is executed on by issuance of a writ of execution. The sheriff levies the writ upon the goods and chattels of the debtor, taking them actually or constructively into his possession. The various items levied upon are then identified and are subject to valua-

tion and inspection. If necessary, the sheriff then holds an execution sale. Such procedure is anticipated by the Uniform Commercial Code [§ 34–21–960(e), W.S.1977, Cum.Supp.1985]." 596 P.2d at 322.

■ We cannot find anything in Wyoming law which allows a creditor to repossess collateral and do nothing with it, then commence suit on the underlying obligation. It seems that the creditor can only:

1. Repossess the collateral and sell it. White and Summers, Uniform Commercial Code 2d, § 26–9, p. 1108 (1980); U.C.C. § 9–504; § 34–21–963, W.S.1977, Cum. Supp.1985; *Farmers State Bank of Parkston v. Otten,* 87 S.D. 161, 204 N.W.2d 178 (1973). See *Stephens v. Sheridan Public Employees Federal Credit Union,* Wyo., 594 P.2d 473 (1979), for notice requirements.

2. Repossess the collateral in satisfaction of the debt (also known as strict foreclosure). White and Summers, supra, § 26–8, p. 1104; U.C.C. § 9–505(2); § 34–21–964(b), W.S.1977, Cum.Supp.1985; and see *Western National Bank of Casper v. Harrison,* Wyo., 577 P.2d 635 (1978); or

3. Obtain a judgment, then execute on the judgment, i.e., have the sheriff repossess the collateral. *Eggeman v. Western National Bank,* supra; White and Summers, supra, § 26–4, pp. 1090–1094; U.C.C. § 9–501; § 34–21–960(e), W.S.1977, Cum. Supp.1985; § 1–17–301, et seq., W.S.1977.[3]

The Bank in this case appears to have chosen alternative three. Yet, as pointed out in *Eggeman v. Western National Bank,* supra, and White and Summers, supra, § 26–4, p. 1092:

"Generally, the creditor must first commence suit and obtain a judgment for the debt owed. After judgment the clerk of the court will, on request, issue a 'writ of execution' (or the like). This writ recites that a judgment has been obtained and directs the sheriff or other appropriate

---

**3.** The three alternatives of the creditor which we name here are listed in *Eggeman v. Western National Bank,* supra, as alternative remedies four and five. Alternative remedies one through three from the *Eggeman* opinion do not apply in this case.

officer to seize the property of the debtor and sell it to satisfy the judgment debt. With the writ in hand, the officer will levy against the debtor's property at his home or place of business (i.e., exercise dominion over it such that it is safely preserved for satisfaction of the debt). Finally, after giving public notice, the officer will sell the property at a public auction to the highest bidder and then turn proceeds necessary to satisfy the debt over to the creditor. The surplus, if any, goes to the debtor. An attractive alternative to levy is garnishment of the debtor's most liquid asset—his wages."

The record on appeal includes the summary judgment order, garnishee notice and summons, which was served on Durdahl's employer, and the writ of execution against Durdahl's goods and chattels. Inclusion of these documents suggests that the Bank has chosen to use the procedure for executing on the judgment. However, the Bank repossessed Durdahl's collateral prior to commencing suit and obtaining judgment on the debt owed.

" * * * [A]t some point the secured creditor must choose which remedy he will utilize and pursue that route to fruition. In other words, a secured creditor may first attempt to enforce his rights by one method and if that proves unsuccessful follow another one, but he should not be permitted to harass the debtor by simultaneously pursuing two or more of the several avenues of attack open to him. Neither case law nor the language of 9–501 [§ 34–21–960, W.S.1977, Cum. Supp.1985] authorizes a 'double-barreled' attack upon the debtor." White and Summers, supra, § 26–4, pp. 1093–1094.

Appellant cites *Farmers State Bank of Parkston v. Otten*, supra, which is factually somewhat similar to appellant's predicament. This opinion quotes from *Michigan National Bank v. Marston*, 29 Mich. App. 99, 185 N.W.2d 47 (1970):

" * * * It would be unfair to allow a creditor to deprive the debtor of the possession and use of the collateral for an unreasonable length of time and not ap-ply the asset or the proceeds from its sale toward liquidation of the debt. Moreover, it would be equally unfair to allow a creditor to take possession at all, if the creditor never intended to dispose of the security. For during the period that the debtor is deprived of possession he may have been able to make profitable use of the asset or may have gone to far greater lengths than the creditor to sell. Once a creditor has possession he must act in a commercially reasonable manner towards sale, lease, proposed retention where permissible, or other disposition. * * * If such disposition is not feasible, the asset must be returned, still subject, of course, to the creditor's security interest. To the extent the creditor's inaction results in injury to the debtor, the debtor has a right of recovery." 204 N.W.2d at 181.

Some courts have held that the *trier of fact* must determine what length of time is reasonable before a creditor who has repossessed collateral is deemed to have retained the collateral in satisfaction of the underlying debt. *Swanson v. May*, 40 Wash.App. 148, 697 P.2d 1013, 41 U.C.C. Rep. 274 (1985); *Service Chevrolet, Inc. v. Sparks*, 99 Wash. 199, 660 P.2d 760, 35 U.C.C.Rep. 1371 (1983); *Mount Vernon Dodge, Inc. v. Seattle-First National Bank*, 18 Wash.App. 569, 570 P.2d 702, 23 U.C.C.Rep. 247 (1977); *Shultz v. Delaware Trust Co.*, Del.Super., 360 A.2d 576, 19 U.C.C.Rep. 1402 (1976). That the repossessed compressor was still in the constructive possession of the Bank at the time of oral argument in this case leads us to conclude that the trier of fact should have an opportunity to determine whether the Bank has by implication already elected to retain the compressor *in satisfaction of the debt*. *Hinkle v. Rock Springs National Bank*, 538 F.2d 295 (10th Cir.1976); § 34–21–964, W.S.1977, Cum.Supp.1985 (U.C.C. § 9–505).

Also, the Bank's right to obtain judgment on the promissory note while in possession of collateral with an appraised value which exceeds the debt on the note, is a serious question which renders inappropri-

ate the Bank's entitlement to judgment as a matter of law. Section 34–21–963(b), W.S.1977, Cum.Supp.1985 (U.C.C. § 9–504).

We decline to specifically state any determinative rule of law on the foreclosure alternatives since the record lacks sufficient definition to enable us to avoid a hypothetical assumption. *Kimbley v. City of Green River,* Wyo., 642 P.2d 443 (1982).

"* * * This court is primarily a court of review except in cases in which this court has original jurisdiction or where a constitutional question is legally certified to this court. It is not its function to determine the facts and the law in a case in the first instance." *Buckman v. United Mine Workers of America,* 80 Wyo. 199, 339 P.2d 398, reh. denied 80 Wyo. 199, 342 P.2d 236 (1959).

## IV

### *Title to the Bus*

■ Who owned the bus at the time it was destroyed is, in our opinion, a genuine issue of material fact. The pleadings, affidavits and exhibits in the record certainly do not provide a necessarily believable answer. Neither the Bank's complaint nor its president's affidavit makes mention of the bus. The promissory note lists the bus as security. Durdahl's amended answer and counterclaim assert that the Bank repossessed the bus and had a duty to insure it. Hedges' affidavit states that the Bank made him put the title to the bus in the Bank's name, and that the Bank failed to inform Hedges that it had received notice that the insurance on the bus had or would expire. Durdahl's affidavit states that: "Mr. Hedges purchased the Greyhound bus and began refurbishing the same." Durdahl's Statement of Proceeding states that the Bank's attorney denied that the title to the Greyhound bus was held in the Bank's name. In the Bank's Statement of Proceedings it objects to the insinuation that the Bank conceded that the title to the bus was placed in its name. For the record now before us, no one produced a title. By remand, we will leave for trial any determination of the finite facts and whether the Bank had constructive possession through its direct relationship with Hedges. The affidavits at present juncture do not develop a controverted issue of fact.

If the Bank did have title to the bus placed in its name, or even if the Bank constructively possessed the bus at the time it was destroyed, the question arises as to who should bear the loss. A reading of *Wisconics Engineering, Inc. v. Fisher,* Ind.App., 466 N.E.2d 745, 39 U.C.C.Rep. 1151 (1984), informs us that:

"* * * [I]t has been held that where the secured party destroys the collateral while it is in his possession, *Tanenbaum v. Economics Laboratory, Inc.,* [Tex., 628 S.W.2d 769, 33 U.C.C.Rep. 124 (1982)] * * * he will be found to have retained the collateral in complete satisfaction of the debt." 466 N.E.2d at 764.

Also, § 34–21–926, W.S.1977, may have a bearing on the issue of who should bear the loss:

"(a) A secured party must use reasonable care in the custody and preservation of collateral in his possession. * * *

\*  \*  \*  \*  \*  \*

"(c) A secured party is liable for any loss caused by his failure to meet any obligation imposed by the preceding subsections but does not lose his security interest."

Who owned the bus, and who should bear the loss of the bus are issues which merit factual determination and legal resolution. We will not now hypothetically assume what those conclusions should be.

## V

### *Attorney's Fees*

The Bank submitted an affidavit from a practicing Casper attorney stating that the $5,000 attorney's fee was reasonable. After citing his membership in the Bar and his experience in collection suits, the affiant stated:

"3. A reasonable and customary fee for collection work in cases in which a Promissory Note is involved is an amount be-

tween five and ten percent of the face amount of the note, particularly in cases where post-judgment collection efforts may be necessary.

"4. In the instant case, your Affiant understands the Defendant to owe a sum in excess of Fifty-Three Thousand Dollars ($53,000.00) plus accruing interest.

"5. A reasonable attorney's fee in this case is therefore Five Thousand Dollars ($5,000.00).

"6. This fee is consistent with and based upon the criteria set forth in the American Bar Association Standards relative to attorney's fees."

This affidavit is quite similar to the one found to be insufficient in *Greenough v. Prairie Dog Ranch, Inc.*, Wyo., 531 P.2d 499, 503 (1975).[4] We said in that case:

" * * * Unless and until there be some evidence in the record besides the customary fee, we see no basis for determination of the other important and necessary factors upon which the reasonableness of the fee should be based." 531 P.2d at 504.

These important and necessary factors for determining the reasonableness of the fee include:

" * * * (1) the qualities of the advocate: his ability, training, education, experience, professional standing and skill; (2) the character of the work to be done: its difficulty, intricacy, importance, the time and skill required, the responsibility imposed and the prominence and character of the parties when they affect the importance of the litigation; (3) the work actually performed by the lawyer: the skill, time and attention given to the work; and (4) the result: whether the attorney was successful and what benefits were derived. [Citations.]" *Schouweiler v. Yancey Company*, Nev., 712 P.2d 786, 790 (1985).

Also see these factors organized in a different fashion in *Greenough v. Prairie Dog Ranch, Inc.*, supra; *Anderson v. Meier*, Wyo., 641 P.2d 187, 192 (1982); *Downing v. Stiles*, Wyo., 635 P.2d 808 (1981).[5] No comfort is afforded by appellee's citation of *Anderson v. Meier*, supra, since

**4.** We quote from *Greenough v. Prairie Dog Ranch, Inc.*, supra, the description of the affidavit which was submitted in that case:

" * * * [A]fter the recitation of his membership in the Bar and experience, [the affiant attorney] sets out the following:

" 'That in Affiant's experience the normal attorney's fee awarded by the courts in mortgage foreclosure actions is 10 percent of the principal and interest due thereon.

" 'That in Affiant's opinion 10 percent of the principal and interest in the present action or the sum of $47,737.33 is a reasonable attorney's fee.' " 531 P.2d at 503.

**5.** This court has adopted the American Bar Association's Code of Professional Responsibility, as amended by the American Bar Association and Wyoming State Bar, as the ethical standards relating to the practice of law in this state. The code includes factors "to be considered as guides in determining the reasonableness of a fee." They are:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

"(3) The fee customarily charged in the locality for similar legal services;

"(4) The amount involved and the results obtained;

"(5) The time limitations imposed by the client or by the circumstances;

"(6) The nature and length of the professional relationship with the client;

"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;

"(8) Whether the fee is fixed or contingent." Rule 20, Amended Rules Adopted by the Supreme Court of Wyoming Providing for the Organization and Government of the Bar Association of the Attorneys at Law of the State of Wyoming, DR 2–106(B).

This court in *Greenough v. Prairie Dog Ranch, Inc.*, supra, was encouraged to require a claimant to introduce evidence of all the above factors, but declined that invitation, saying:

"We view this section [of the Code of Professional Responsibility] as helpful and pertinent to the problem of the determination of a reasonable attorney's fee but do not adopt this as a rule of evidence for such determination." 531 P.2d at 504.

See also *DeWitt v. Balben*, Wyo., —— P.2d —— Nos. 85–127 and 85–128 (decided April 23, 1986).

Harold Meier, the affiant, was the party who incurred the expenses and as a practicing attorney was knowledgeable about the work involved and the reasonableness of the amounts charged *as his debt.*

The affiant for the Bank of Casper must revise his determination of a reasonable fee to reflect consideration of these other factors. A conclusory statement that the fee is "consistent with and based upon the criteria set forth in the American Bar Association Standards relative to attorney's fees" is insufficient. Claims for attorney's fees not satisfying the evidentiary requirements of Prairie Dog and *Shanor v. A-Pac, Ltd.,* Wyo., 711 P.2d 420 (1986), can be expected to be summarily reversed upon appeal.

## VI

### *Balance Due on the Note*

On the record now before us, we have the following reflected as existent facts. The note was $70,000; after $30,000 was advanced, the Bank declined to make additional advances, and then advanced funds on a separate obligation of Hedges until his credit was exhausted. Thereafter, it made a further advance to Hedges, and charged the amount to the note of Durdahl. We can assume separate facts, which might encompass estoppel, waiver, concurrence, nonconcurrence, unauthorized advance, and so forth, each of which, under applicable rules of law, might determine the liability for any additional amount advanced after the original $30,000. The present record certainly does not demonstrate that the additional $10,000 (or $12,500) was properly chargeable as a note debt to Durdahl. Since this case came to us from an order sustaining the motion for summary judgment, we will not now presuppose either what the facts may be on trial, or what the appropriate rule might be when the facts are determined.

We have discussed the requirements for entry of summary judgment innumerable times, and however those standards may be stated cannot find the required burden of the plaintiff to have been met by the present evidentiary status of this case. *Garner v. Hickman,* Wyo., 709 P.2d 407 (1986). See excellent discussion in *Fegler v. Brodie,* Wyo., 574 P.2d 751 (1978).

## VII

### *Motion for Leave to Amend*

To avoid a further appeal before completion of a trial wherein all facts are determined, comment will be made about the motion for leave to amend. Reference is made for direction to Rule 13, W.R.C.P., compulsory counterclaim, and Rule 15(a), W.R.C.P., "leave shall be freely given when justice so requires." It is consequently anticipated that any appropriate amendments will be resolved in advance, for a complete resolution of the issues at one trial.

Reversed and remanded for further proceedings in conformity herewith.